Filed 2/24/15  P. v. Larumbe CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B254678 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA399231) |
| v. | |
| LUIS LARUMBE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed as modified.

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Luis Larumbe killed Victor Moreno by repeatedly stabbing him with a knife. A jury convicted Larumbe of first degree murder, finding true the special allegation he had personally used a deadly or dangerous weapon in committing the offense. On appeal Larumbe argues there was insufficient evidence of premeditation and deliberation to support the first degree murder verdict. We agree and modify the judgment by reducing the conviction to second degree murder (Pen. Code, §§ 1181, subd. 6 & 1260) and modifying Larumbe's sentence to an indeterminate 16-year-to-life term, rather than the 26-year-to-life term imposed by the trial court.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Summary of the Evidence Presented at Trial*

On July 12, 2011 Los Angeles Police Detective Stephanie Carrillo and her partner, Detective Jose Ramirez, responded to a radio call about a possible homicide near Hollenbeck Park. When Carrillo and Ramirez arrived, they found Moreno's dead body lying face down on a Caltrans dirt easement adjacent to the park. He had been stabbed multiple times. A serrated knife, broken into two pieces, was on the ground by Moreno's head, and a foam mattress and comforter were nearby. It did not appear Moreno's body had been dragged or moved to the location.

Officer Carrillo noticed a trail of blood leading away from Moreno's body. She followed the blood trail across the easement, through a hole in the chain link fence separating the easement from the park, down a hill and west on Boyle Avenue until the trail ended. Sample swabs were taken from some of the blood stains.

---

[1] Larumbe also contends, and the Attorney General concedes, the minute order entered following sentencing, as well as the abstract of judgment, erroneously identifies the amounts of the restitution fine (Pen. Code, § 1202.4) and (stayed) parole revocation fine (Pen. Code, § 1202.45) as $280 each instead of $200, the minimum fine applicable when Larumbe committed the offense and the sum the trial court orally imposed at the sentencing hearing. Accordingly, in addition to reducing the conviction to second degree murder, we modify the written judgment to reflect restitution and parole revocation fines of $200. Upon issuance of the remittitur the superior court is directed to correct the abstract of judgment to reflect these modifications and to forward a copy of the corrected abstract to the Department of Corrections and Rehabilitation.

Larumbe was not identified as a suspect until September 20, 2011 when Eligio Hernandez, who had been talking to the police about another case, said he had information about a stabbing in Hollenback Park earlier that year. Consistent with what he told Detective Ramirez during an interview, Hernandez testified at trial he and Larumbe lived together in July 2011 in an apartment near Hollenbeck Park and slept in bunk beds. On July 11, 2011 Larumbe was out all evening. Hernandez heard Larumbe return around 4:30 a.m. on July 12, 2011. When Hernandez got out of bed a few hours later, he saw blood on Larumbe's clothes and a cut on his hand. He asked Larumbe what had happened. Larumbe, who always carried a knife in a backpack (either a small knife or a kitchen knife), said he had stabbed and killed someone who had confronted him in Hollenbeck Park, which he occasionally visited and where he sometimes slept.[2] Hernandez initially testified Larumbe did not tell him the reason Moreno had confronted him. During cross-examination defense counsel asked Hernandez whether he remembered telling Ramirez that Larumbe had said Moreno slept in his spot and they had a dispute. Hernandez responded, "Yes. I think so. I remember a little bit of that."[3] Hernandez did not contact police sooner because Larumbe had threatened to kill Hernandez and his family if Hernandez told anyone. They stopped living together in September 2011 after Larumbe attacked him.

Dr. Paul Gliniecki, the deputy medical examiner who had performed the autopsy, testified the cause of Moreno's death was multiple sharp force and blunt force traumatic injuries. Moreno had approximately 179 sharp force trauma wounds consistent with the use of a knife, divided roughly evenly between incise and stab wounds, on the upper half

---

[2]    Detective Ramirez testified transients frequently slept in Hollenbeck Park and on the easement where Moreno was found. Hernandez had told Ramirez that Larumbe often stayed at Hollenbeck Park for two to three days and would walk or bicycle there. However, in a recorded interview Larumbe denied sleeping in the park, hurting anyone or getting injured there. He also denied carrying a knife.

[3]    Detective Ramirez testified Hernandez had said there was some sort of a dispute over a sleeping spot.

of his body and his head.[4] The majority of the wounds were not fatal or rapidly fatal, but Gliniecki considered several that had punctured a lung as fatal. Moreno also had several blunt force trauma injuries to his face and extremities, as well as defense wounds on his right arm, left palm and legs.[5] Gliniecki could not determine whether the sharp force or blunt force wounds occurred first, in what order the sharp force wounds were made or if any of the stab wounds were made after Moreno was already dead. However, Gliniecki agreed with defense counsel that it would have taken "a while" for the assailant to have made the stab wounds. It was stipulated Moreno's blood-alcohol level was 0.23 percent at the time of his death.

Dr. Quang Nguyen, a criminalist who performed DNA testing, testified a blood sample taken from the broken blade of the knife had a major single source profile that matched Moreno's. Blood on the knife handle contained a mixture of Moreno and Larumbe's DNA. Two stains on the blood trail leading away from Moreno's body had DNA profiles matching Larumbe's.

Larumbe did not testify or offer any evidence, other than through cross-examination of the People's witnesses, in his own defense.

2. *Jury Instructions, Verdict and Sentence*

The jury was instructed with CALCRIM Nos. 520 (murder); 521 (degrees of murder); 570 (voluntary manslaughter based on killing because of a sudden quarrel or in the heat of passion); 522 (provocation reducing first degree murder to second degree murder or voluntary manslaughter); 505 (self-defense); and 571 (imperfect self-defense). CALCRIM No. 521 as given stated in part, "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with

---

[4] Dr. Gliniecki explained stab wounds are deeper than the length of the surface wound and incise wounds are longer on the surface than they are deep.

[5] The autopsy report identified four defensive wounds. Gliniecki testified, however, some of the other wounds were consistent with defensive wounds. In any event, even considering those as defensive wounds, the number was small compared to the number of times Moreno was stabbed.

4

premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

The jury began deliberating on Friday, January 31, 2014, at 2:45 p.m, and was excused for the weekend 45 minutes later. Shortly after deliberations resumed on Monday, February 3, 2014, the jury asked, "Can premeditation occur <u>during</u> the murderous act?"[6] The jury was instructed to reread CALCRIM No. 521. Approximately one hour later the jury returned with a verdict, finding Larumbe guilty of first degree murder and finding true the special allegation he had personally used a deadly or dangerous weapon (a knife).

The trial court sentenced Larumbe to a state prison term of 26 years to life, comprised of 25 years to life for first degree murder plus an additional year for the deadly weapon enhancement.

**DISCUSSION**

1. *Standard of Review*

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential lements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find

---

[6]     The word "during" was underlined twice.

the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

2. *There Is Insufficient Evidence of Premeditation and Deliberation To Support the Verdict of First Degree Murder*

a. *Governing Law*

"'""A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]" [Citation.] "'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"'"'" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) In contrast, second degree murder is an unlawful killing with malice—either express (intent to kill) or implied (the intentional commission of a life-threatening act with conscious disregard for life)—but without the elements of willfulness, premeditation and deliberation. (See *People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*) the Supreme Court "[r]ecognize[d] the need to clarify the difference between [first and second degree] murder and the bases upon which a reviewing court may find that the evidence is

6

sufficient to support a verdict of first degree murder . . . ." (*Id.* at p. 26.) After "set[ting] forth standards, derived from the nature of premeditation and deliberation as employed by the Legislature and interpreted by [the Court], for the kind of evidence which is sufficient to sustain a finding of premeditation and deliberation" and analyzing representative cases, the Court set forth the benchmark standard. As summarized in *People v. Elliot* (2005) 37 Cal.4th 453, "'Generally, there are three categories of evidence that are sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] When evidence of all three categories is not present, "[a reviewing court] requires either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing . . . .""" (*Id.* at p. 471; see *People v. Alcala* (1984) 36 Cal.3d 604, 626 ["Evidence in only one of these areas most often is insufficient. Where fewer than all three indicia are present, we require 'at least extremely strong evidence of (1) [planning] or evidence of (2) [motive] in conjunction with either (1) or (3) [deliberate manner of killing].'"].) "'But these categories of evidence, borrowed from [*Anderson*] "are descriptive, not normative." [Citation.] They are simply an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.""" (*Elliot*, at p. 471.)

   b. *The evidence was insufficient to support an inference of planning*

Planning is the "most important prong of the *Anderson* test." (*People v. Alcala*, *supra*, 36 Cal.3d at p. 627; accord, *People v. Pensinger* (1991) 52 Cal.3d 1210, 1238.) Although a plan may be "rapidly and coldly formed" just before a killing (see *People v. Mendoza*, *supra*, 52 Cal.4th at p. 1070 [evidence defendant devised plan to kill officer when officer indicated he would conduct pat search was substantial evidence killing was planned]; *People v. Brady* (2010) 50 Cal.4th 547, 563 [evidence of plan sufficient even though defendant shot police officer "only a few minutes passed between the time Officer Ganz first shined his patrol vehicle's spotlight on defendant's car and the shooting"]), there must nevertheless be "substantial evidence that the killing did not result from

7

unconsidered or rash impulse." (*Mendoza*, at p. 1070; see *Anderson*, *supra*, 70 Cal.2d at p. 26 [describing "'planning'" activity as "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing"].) The only evidence as to what may have transpired between Larumbe and Moreno before the killing was Hernandez's testimony Larumbe had said Moreno confronted him and there may have been some sort of a dispute about a sleeping spot. Unlike in *Mendoza*, *supra*, 52 Cal.4th 1057 and *People v. Brady*, *supra*, 50 Cal.4th 547, in which there was eyewitness testimony about what had transpired prior to the shooting and the shooting itself, there is simply nothing here that supports an inference of planning activity. To the contrary, to the extent the jury may have believed the killing was the product of an argument about an outdoor sleeping spot, it suggests a rash or impulsive act, not one informed by careful thought and deliberation.

The Attorney General argues Larumbe's possession of a kitchen knife in advance of the killing amply supports an inference of planning. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 578 ["defendant, armed with a concealed firearm, left his room at the motel, angrily confronted the victim, and fired several times, inflicting multiple wounds to the victim's chest"]; *People v. Steele* (2002) 27 Cal.4th 1230, 1250 ["[a]s to planning, the jury could infer that defendant carried the fatal knife into the victim's home in his pocket, which makes it 'reasonable to infer that he considered the possibility of homicide from the outset'"].) However, Hernandez testified Larumbe always carried a knife with him—sometimes a small knife and sometimes a kitchen knife. No evidence indicated he had specifically armed himself in advance of his encounter with Moreno, in contrast to the many cases in which possession of a deadly weapon was evidence from which planning could be inferred. (See *People v. Wright* (1985) 39 Cal.3d 576, 593 & fn. 5 ["[a]fter confronting [victim], defendant returned to his trailer and obtained a loaded weapon"; "'[o]f course, use of a deadly weapon is not always evidence of a plan to kill[]'" [citation], but obtaining such a weapon in advance of a killing is one fact that has been held to support an inference of planning activity"]; cf. *People v. Wharton* (1991)

53 Cal.3d 522, 547 [defendant killed sleeping victim with hammer; evidence suggested he either removed hammer from his toolbox in advance for purpose of killing victim or retrieved it from garage after arguing with the victim and returning to his bedroom].)[7] Indeed, a knife, unlike a gun, has many legitimate uses for someone like Larumbe, who often slept at Hollenbeck Park for up to three nights at a time. Absent any evidence Larumbe used the knife to engage in illicit activity there, his possession of the knife is not sufficient to support an inference he carried it because he planned to kill somebody. (See *People v. Morris* (1988) 46 Cal.3d 1, 23 [defendant brought revolver to bathhouse during early morning and "evidence strongly suggest[ed] that homosexual prostitution was involved"; it was reasonable to infer defendant "'considered the possibility of homicide from the outset'"], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5.)

Without citation or elaboration, the Attorney General also argues Larumbe's escape from the murder scene supported an inference of planning. In *People v. Morris*, *supra*, 46 Cal.3d at pages 22-23 the Court did find the defendant's escape, in conjunction with his possession of a weapon in advance of the killing, substantial evidence supporting an inference of planning activity. There, however, the defendant made a "rapid escape to a waiting car" moments after the killing. In contrast, Larumbe left the murder weapon next to Moreno's head and either walked or rode his bicycle home in bloody clothing, leaving a trail of blood that stopped, according to Detective Carillio, about a three-minute

---

7    *People v. Steele*, *supra*, 27 Cal.4th 1230, is readily distinguishable. Although the court identified the defendant's carrying of a knife into the victim's home in his pocket as a reasonable basis to infer he had considered the possibility of homicide in advance, the inference was "much stronger in [that] case, because defendant had already stabbed another woman to death. When a person stabs a woman to death, then leads another woman into her apartment with a knife in the pocket, the jury can readily infer that the person possessed the knife for the same purpose. Additionally, as the trial court noted . . . , Richard Blakeslee testified that when he was speaking with 'Lee Ann,' whom the jury could reasonably have found was the victim, he heard defendant say, 'Put the phone down or I'll kill you.' This evidence suggests a planned killing." (*Id.* at p. 1250.) In the case at bar, there is nothing more than Larumbe's routine possession of a knife, which is insufficient standing alone to support an inference the killing was planned.

drive or 15-minute walk from Larumbe's apartment. There was no waiting car or other means of quickly transporting him from the crime scene that might support an inference he had planned to kill someone in the park. Given the undisputed fact that Larumbe killed Moreno, it would be unreasonable to expect him simply to remain at the crime scene.

          c. *There was no evidence of motive that would reasonably support an inference of premeditation*

Evidence of motive as defined in *Anderson* is similarly absent. "The second *Anderson* factor refers not merely to a motive to kill, but to the kind of motive that 'would in turn support an inference that the killing was the result of a "pre-existing reflection" and "careful thought and weighing of considerations" *rather than* "mere unconsidered or rash impulse hastily executed."'" (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1266.) For example, the Supreme Court has found motive supporting an inference of premeditation when there was evidence the victim could implicate the defendant in a crime against a third person or even the victim. (See *People v. Elliot*, *supra*, 37 Cal.4th at p. 471 ["jury could have construed the evidence as establishing a motive, such as that defendant deliberately intended to kill Gandy to eliminate her as a witness to the attempted robbery and torture"]; *People v. San Nichols* (2004) 34 Cal.4th 614, 658 ["prosecution credibly advanced the theory that defendant killed April because she was . . . the lone witness to his crime [(murder)] against Mary, and her killing served to facilitate his escape"]; *People v. Perez* (1992) 2 Cal.4th 1117, 1126-1127 ["regardless of what inspired the initial entry and attack, it is reasonable to infer that defendant determined it was necessary to kill Victoria to prevent her from identifying him"; Victoria knew defendant "and obviously would have been able to identify him"]; *People v. Alcala*, *supra*, 36 Cal.3d at p. 627 ["apparently there were no eyewitnesses to the abduction except defendant and his victim"].)

The Attorney General argues the jury could infer Larumbe's motive to kill Moreno from Hernandez's testimony that Larumbe had said there was a dispute over a sleeping spot. Even if Hernandez's hazy recollection of having mentioned Larumbe's comment to

10

Detective Ramirez and Ramirez's testimony confirming it are given full weight, in conjunction with Hernandez's unequivocal and repeated insistence Larumbe said Moreno had confronted him, this evidence at most suggests Larumbe killed Moreno based on rash impulse in response to the circumstances, not the careful thought and weighing of considerations necessary to find premeditation and deliberation. (See *People v. Boatman*, *supra*, 221 Cal.App.4th at p. 1268 [victim's text messages to friend she had been fighting with defendant and evidence of loud screaming argument "do not suggest this kind of motive"].)

### d. *The brutality of Moreno's murder, standing alone, is insufficient to support a conviction for first degree murder*

The *Anderson* Court explained evidence about the manner of killing that, in combination with circumstantial evidence of planning and motive, might justify finding an intentional killing was premeditated encompasses "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts" of planning and motive. (*Anderson*, *supra*, 70 Cal.2d at p. 27.) Notwithstanding the clear implication in *Anderson* that the manner of killing alone is insufficient to support a conviction for first degree murder, the Supreme Court in subsequent decisions has held "the method of killing alone can sometimes support a conclusion that the evidence sufficed for a finding of premeditated, deliberate murder." (*People v. Memro* (1995) 11 Cal.4th 786, 863-864.) One such method is execution-style murder. (See *People v. Hawkins* (1995) 10 Cal.4th 920, 957 ["In [*People v. Bloyd* (1987) 43 Cal.3d 333] the forensic evidence 'described actions that were cold and calculated,' shots to the head taken at extremely close range while one of the victims was on her back, the other kneeling, with no bruises and lacerations to show a struggle. [Citation.] Although the *Bloyd* court found evidence of motive as well, such evidence is not indispensable to proving premeditation when the manner-of-killing evidence is so compelling."].)

In the instant case Moreno was repeatedly stabbed and hit or kicked, which, according to the deputy medical examiner, may have taken "awhile." There is little question the jury's verdict was influenced by the amount of time it may have taken Moreno to stab and beat Larumbe: The jury asked soon after deliberations began whether premeditation could "occur <u>during</u> the murderous act." After being told to reread CALCRIM No. 521, which instructed a deliberate decision to kill can be reached "quickly," the jury returned its verdict. The manner of Moreno's murder, however, without any evidence of motive or planning simply cannot support a finding of premeditated and deliberate murder. (See *Anderson*, *supra*, 70 Cal.2d at p. 24 ["[i]t is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation"]; *People v. Alcala*, *supra*, 36 Cal.3d at p. 626 ["The fact that a slaying was unusually brutal, or involved multiple wounds, cannot alone support a determination of premeditation. Absent other evidence, a brutal manner of killing is as consistent with a sudden, random 'explosion' of violence as with calculated murder."].)

None of the cases cited by the Attorney General—*People v. San Nichols*, *supra*, 34 Cal.4th at pages 658-659, *People v. Pride* (1992) 3 Cal.4th 195, 247-248, *People v. Elliot*, *supra*, 37 Cal.4th at page 471—in which the victim sustained multiple wounds supports the proposition the manner of killing here, without more, is sufficient for a finding of premeditated and deliberate murder. In each of these cases there was also evidence of planning and motive, evidence that is absent here. (See *San Nichols*, at p. 658 [evidence defendant killed victim because "she saw him in the bathroom covered in Mary's blood and carrying a knife as he attempted to clean up, and defendant saw in the bathroom mirror that [victim] had seen him at this critical juncture"]; *Pride*, at p. 247 [evidence of two possible motives including to "silence [victim] as a possible witness to her own sexual assault"; testimony supported inference defendant waited until victim was alone and then followed or forced her to secluded location in building]; *Elliot*, at pp. 457-459, 471[bartender responsible for closing bar killed in storeroom where safe was kept; evidence money was missing, defendant had armed himself with knife and surveyed bar

12

before attack and waited until all customers left].) The infliction of multiple wounds was simply additional evidence consistent with a finding of premeditation and deliberation. Indeed, the deputy medical examiner also testified it was impossible to determine which stab wounds occurred first—the fatal puncture of Moreno's lung may have occurred early—or whether any of the wounds were inflicted after he had already died. Because, as the jury was instructed, premeditation must occur before the defendant has completed the acts that caused death (see CALCRIM No. 521), any inference Moreno carefully considered killing Larumbe during the beating, but before he was killed, is highly speculative and insufficient to support the first degree murder conviction. (See *Anderson, supra*, 70 Cal.2d at p. 25 [reviewing court must determine when prosecution relies on circumstantial evidence "whether the proof is such as will furnish a *reasonable foundation* for an inference of premeditation and deliberation [citation] or whether it 'leaves only to *conjecture and surmise* the conclusion that defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation'"].)

To be sure, the Supreme Court has repeatedly emphasized that *Anderson*, *supra*, 70 Cal.2d 15 "'''did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.''''" (*People v. Mendoza*, *supra*, 52 Cal.4th at p. 1069; see *People v. Manriquez, supra,* 37 Cal.4th at p. 577 ["*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive"]; *People v. Welch* (1999) 20 Cal.4th 701, 758 ["[a]s we have stated, these guidelines 'were formulated as a synthesis of prior case law, and are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case'"]; *People v. Thomas* (1992) 2 Cal.4th 489, 517 [explaining *Anderson* "did not refashion the elements of first degree murder or alter the substantive law of murder in any way"].) Nevertheless, when affirming a first degree murder conviction, the Court has inevitably identified at least some evidence of planning, motive and method of killing that supports the finding of premeditation and deliberation, even if academic critics have

13

complained these decisions blur any meaningful distinction between first degree murder and express malice, second degree murder. (See, e.g., Mounts, *Premeditation and Deliberation in California: Returning to a Distinction Without a Difference* (2002) 36 U.S.F. L.Rev. 261, 307-328; see generally Ferzan, *Plotting Premeditation's Demise* (2012) 75 Law & Contemp. Problems 83.)

Viewing the entire record in the light most favorable to the People, there is abundant evidence to support the jury's verdict of murder but insufficient evidence to support the finding Larumbe killed Moreno with premeditation and deliberation. Accordingly, pursuant to Penal Code section 1181, subdivision 6,[8] we modify the judgment by reducing Larumbe's conviction to second degree murder (see *People v. Steger* (1976) 16 Cal.3d 539, 553; *People v. Boatman*, *supra*, 221 Cal.App.4th at p. 1274), with a commensurate reduction in his sentence from 26 years to life to 16 years to life. (See Pen. Code, §§ 190, subd. (a) [sentence for second degree murder]; 12022, subd. (b)(1) [one-year enhancement for personal use of a deadly weapon during commission of a felony].)

---

[8]   Penal Code section 1181, subdivision 6, states "When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed."

## DISPOSITION

The judgment is modified to reflect a conviction for second degree murder with a sentence, including deadly weapon enhancement, of 16 years to life. The judgment is further modified to reflect a restitution fine of $200 and a parole revocation fine (stayed) of $200. As modified, the judgment is affirmed. The superior court is directed to prepare a corrected abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


PERLUSS, P. J.


We concur:


WOODS, J.


ZELON, J.